No. 31 June 15, 2017 527

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

DANNY LEE BLAIR,
*Respondent on Review.*

(CC 131055; CA A156756 SC S064262)

On review from the Court of Appeals.*

Argued and submitted March 9, 2017, at the University of Oregon School of Law, Eugene.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Laura E. Coffin, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Brewer, Nakamoto, and Flynn, Justices.**

BREWER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings consistent with this decision.

_____

\* Appeal from Tillamook County Circuit Court, Jonathan R. Hill, Judge. 278 Or App 512, 380 P3d 313 (2016).

\*\* Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case.

**BREWER, J.**

Before his trial on a charge of possession of a controlled substance, defendant moved to suppress the state's primary evidence—drugs that a police officer found in a warrantless but purportedly consensual search of defendant's backpack—on the ground that they were obtained in violation of Article I, section 9, of the Oregon Constitution. The trial court denied the motion and defendant was convicted. The Court of Appeals reversed and remanded, concluding that defendant's consent to the search of his backpack did not extend to untying and looking into an opaque grocery bag, inside the backpack, in which the drugs were found. *State v. Blair*, 278 Or App 512, 522, 380 P3d 313 (2016).

The state seeks review of that decision, arguing that defendant's unqualified consent to the police officer's generalized request to search the backpack should be deemed on the record before us to encompass consent to open any closed but unlocked containers found inside. We conclude that the state's argument does not comport with Article I, section 9. We further conclude that the dispositive inquiry is a factual one: Did defendant intend to consent to the search of closed containers inside his backpack? It is unclear whether the trial court so understood the inquiry before it, and, on the record before us, we conclude that opposing inferences permissibly could have been drawn from the evidence as to that issue. Accordingly, we reverse the decision of the Court of Appeals, and we vacate the judgment convicting defendant and remand to the circuit court to reconsider its suppression decision under the correct standard.

## I.  FACTS AND PROCEDURAL HISTORY

The facts that are relevant to the issue before us are not extensive. Responding to a report of a man being chased by armed attackers, members of the Tillamook County Sheriff's Office encountered defendant, the supposed victim. Defendant was agitated, disheveled, and somewhat incoherent, and the officers were doubtful that he had, in fact, been attacked. Defendant mentioned to one of the officers, Sergeant Jackson, that he had left his backpack "up on the hill" and that he also had lost his sweatshirt. Defendant

seemed reluctant to go in search of his belongings by himself, so Jackson went with him.

Defendant located the backpack without difficulty. Jackson then asked defendant, in a casual way, if he could search the backpack. Although he did not say so, Jackson suspected that defendant was under the influence of methamphetamine, and he wanted to see if the backpack contained drugs or weapons. Defendant responded, "Yeah, no problem. Go ahead." Inside the backpack, Jackson saw an opaque, plastic grocery bag that was closed with a knot. Jackson untied the knot and found inside the grocery bag, among other items, a Ziploc bag containing psilocybin mushrooms.

Defendant was charged with unlawful possession of a Schedule I controlled substance, ORS 475.752(3)(a). Before trial, he moved to suppress evidence of the mushrooms on the ground that their discovery was the product of an unconstitutional search under Article I, section 9. The state countered that, because defendant had consented to the search of his backpack, the search did not implicate his rights under Article I, section 9. Defendant did not deny having consented to Jackson's request to search the backpack, but he argued that his consent was not voluntary and that, even if it was voluntary, it did not extend to a search of the contents of the knotted grocery bag inside the backpack.

The trial court denied the motion to suppress, holding that defendant's consent was voluntary and that opening and searching the grocery bag was within the scope of that consent.[1] Defendant thereafter entered a conditional no contest plea to the charged offense, and the trial court entered a judgment convicting him.

On appeal, defendant challenged the denial of his motion to suppress, asserting the same arguments that he had raised in the trial court. With respect to the scope of consent issue, the Court of Appeals held that:

---

[1] With respect to that issue, the trial court stated:

"The sergeant had asked for permission to search the backpack. The other bag is inside the backpack. [Defendant] is there when it is searched and the consent wasn't revoked. I think there was a consensual search of the Fred Meyer bag as well."

> "[t]he scope of consent is determined by reference to what a typical, reasonable person would have understood by the exchange between the officer and the suspect in light of the totality of the circumstances surrounding the grant of consent in a particular case. Thus, consent to search a particular location or item extends to closed containers found within that location or inside of that item if, under the totality of the circumstances, a reasonable person would have understood that the consent given included those containers."

*Blair*, 278 Or App at 516 (citations omitted). The court was unpersuaded by the state's argument that, when both a police officer's request and an individual's response are general and unqualified, the scope of consent presumptively includes consent to search closed and unlocked containers found inside the stated object of the search. *Id*. at 519. The court held, instead, that an officer's generalized request for consent to search some place or thing does *not* extend to closed containers inside the place or thing *unless* the surrounding circumstances would reasonably convey that the officers are searching for something that could be hidden in those containers. *Id*. at 520. In the absence of such evidence in the record before it, the court determined that it "[could] not conclude that a reasonable person viewing the exchange would have understood that defendant consented to the search of the knotted grocery bag within his backpack." *Id*. at 522. Because the warrantless search of the knotted bag could not be justified under the consent exception, the court concluded, it was unreasonable and, therefore, unlawful, and the evidence obtained therefrom should have been suppressed.[2] Accordingly, the Court of Appeals reversed defendant's conviction and remanded.

## II.   FRAMING THE ISSUE ON REVIEW

This court granted the state's petition for review and, on review, the parties reprise their arguments before

---

[2] Insofar as the Court of Appeals agreed with defendant that the search of the grocery bag was unlawful because it was not within the scope of defendant's consent, it had no occasion to address defendant's alternative argument that his consent had not been voluntary. Because we vacate the judgment convicting defendant and remand to the circuit court, we likewise do not address that argument.

the Court of Appeals. The primary issue on review—the scope of consent to a warrantless search under Article I, section 9—has not been a frequent subject of consideration by this court. The Court of Appeals, however, has articulated a test for analyzing scope of consent issues under Article I, section 9, and the parties have couched their arguments in terms of that test. As the Court of Appeals conceives the proper test, when consent is asserted as a justification for a warrantless search, the scope of a person's consent "is determined by reference to what a typical, reasonable person would have understood by the exchange between the officer and the suspect *** in light of the totality of the circumstances surrounding the grant of consent in a particular case." *State v. Delong*, 275 Or App 295, 301, 365 P3d 591 (2015), *rev den*, 359 Or 39 (2016) (quoting *State v. Harvey*, 194 Or App 102, 106, 93 P3d 828 (2004)).

Although the state does not challenge the substance of the Court of Appeals' test, it argues for a corollary "default" rule in cases, like the present one, that involve "nested" closed containers. It argues, specifically, that when a person manifests apparently unqualified consent to a law enforcement officer's generalized request to search a closed container, that manifestation of consent authorizes the officer to open all closed, unlocked containers inside the item— unless other specific circumstances show that the scope of consent did not extend that far.

The state asserts that the word "search" itself conveys the idea of a thorough, rigorous inspection of a closed container that a reasonable person would understand to include inspecting the contents of additional closed containers inside the item. The state also contends that the mere fact that a request to search comes from a police officer would indicate to a reasonable person that the officer is looking for evidence of illegal activity, including drugs and weapons that might be hidden inside closed containers. In other words, the state reasons, a generalized request by a police officer to search a closed container would in and of itself indicate to a reasonable person that the request includes opening and the inspection of the contents of closed containers inside the item—and an unqualified affirmative answer to such a request should be deemed to constitute consent to

the opening and inspection of the contents of such additional containers, unless other, specific circumstances indicate a different understanding and intent.

Defendant replies that the state's proposed corollary rule is inconsistent with the "totality of the circumstances" test that, by the state's own concession, should apply: That is so because it gives dispositive significance to two facts (the use of the word "search" and the requester's status as a police officer), while failing to adequately recognize that the import of those facts may depend on other surrounding circumstances. Defendant also argues that the state's proposed rule would effectively impose on a defendant the burden of producing evidence of lack of consent, rather than placing that burden on the state, where it properly belongs. Defendant posits, based on the "totality of the circumstances" test as applied to the present record, and taking into account the state's burden, that defendant would not have understood the scope of his consent to include consent to search any closed container that might be found inside his backpack. Accordingly, defendant argues, the trial court erred in determining that the officer acted within the scope of defendant's consent when he unknotted, opened, and searched the grocery bag in question.

Although the parties focus their arguments on the merits of the state's proposed default rule, we first must consider whether the standard for determining scope of consent from which the state's proposed corollary rule purportedly derives comports with Article I, section 9. That standard was first announced in *State v. Arroyo-Sotelo*, 131 Or App 290, 884 P2d 901 (1994), where the Court of Appeals explained that it was adopting a standard used in Fourth Amendment cases to decide whether, under Article I, section 9, a police officer had complied with the scope of a defendant's consent:

> "In making this inquiry, we first note that the standard for determining the scope of a suspect's consent under the Fourth Amendment is that of 'objective reasonableness' with the critical inquiry focusing on what a 'typical reasonable person would have understood by the exchange between the officer and the suspect.' *Florida v. Jimeno*, 500 US 248, 251, 111 S Ct 1801, 114 L Ed 2d 297 (1991). In our decisions involving the scope of consent under Article I, section 9,

we have never explicitly articulated our standard; however, we have consistently evaluated the intent of the consent of the consenting parties objectively, looking at the totality of the circumstances of the particular case. Similarly, Oregon courts have recognized that questions involving the propriety of police conduct under Article I, section 9, customarily are judged on an objectively reasonable basis, requiring an inquiry into the surrounding circumstances.

"We thus conclude that the 'objective reasonableness' standard articulated in *Florida v. Jimeno*, *supra*, best comports with the requirements of Article I, section 9. \*\*\*

"Under that standard, we must consider what a reasonable person would have understood by the interchange between the officer and defendant, the person giving consent. As discussed above, this requires an evaluation of the surrounding circumstances."

131 Or App at 295-96 (citations omitted).

Although, as noted, the parties here have purported to apply the Court of Appeals' test for determining the scope of defendant's consent to the search of his backpack under Article I, section 9, this court has an independent duty to consider whether it is, in fact, the correct standard. *Cf. Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (court has independent duty to construe statute correctly without regard to parties' arguments). We turn to that task now.

## III.   ANALYSIS

### A.   *Background*

By its terms, Article I, section 9, recognizes a right to be free of "unreasonable" searches and seizures. Warrantless searches are *per se* unreasonable, subject to certain specifically established and limited exceptions. *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015) (subject to certain specifically established and limited exceptions, warrantless searches are deemed to be *per se* unreasonable); *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992) (warrantless search is "reasonable" only if it falls within recognized exceptions to warrant requirement). The state bears the burden of showing by a preponderance of the evidence that an exception to the warrant requirement applies. *See*

*State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994) (so stating as to consent exception).

B.   *Consent Exception*

Most exceptions to the warrant requirement involve a unilateral exercise of governmental authority to intrude, without a warrant, into things or places in which an owner or other person has a cognizable privacy interest, which nevertheless is justified as reasonable if certain circumstances (exigency, officer safety concerns, etc.) are present. *Bonilla*, 358 Or at 487-89.

The consent exception is different. It posits that, by voluntarily granting a governmental actor permission to search a place or thing, the person relinquishes his or her privacy interest in the place or thing so that there is no intrusion by the state into a protected privacy interest that must be justified. *Bonilla*, 358 Or at 480; *State v. Brown*, 348 Or 293, 305, 232 P3d 962 (2010). Of course, that rationale presumes that a person to whom a privacy interest belongs *actually* intends to give consent to the intrusion. We intimated as much in *Bonilla*, when we rejected the premise that Article I, section 9, is satisfied if the police conduct a warrantless search under the mistaken but objectively reasonable belief that the person who gave consent to the search had authority to do so. 358 Or at 486-93. In a similar vein, we have indicated that the scope of consent is to be determined from the standpoint of the consenting person. In *Weaver*, the issue was whether the defendant's consent to a search could be deemed to extend, retroactively, to a portion of the search that had occurred before the defendant gave consent. To support such a conclusion, we held that there must be evidence that "the person giving consent *intended* the consent to be retroactive." 319 Or at 222 (emphasis added).

This court's focus on actual consent as a touchstone of the consent exception under Article I, section 9, is distinct from the way the consent exception operates under the Fourth Amendment. Fourth Amendment decisions do not recognize any analytical difference in perspective between the consent exception and other recognized exceptions to the warrant requirement. The United States Supreme Court

has reasoned that, because other exceptions to the warrant requirement are tested against a standard of objective reasonableness from the point of view of the police, the same standard should apply to the facts bearing on the application of the consent exception. *Illinois v. Rodriguez*, 497 US 177, 186, 110 S Ct 2793, 111 L Ed 2d 148 (1990). In *Rodriguez*, the court concluded that there is no Fourth Amendment violation when the police perform a warrantless search in the objectively reasonable, albeit mistaken, belief that they have obtained consent for the search from a person with authority to give it. *Id*.

Similarly, federal cases addressing the voluntariness of consent generally have declined to consider the consenting person's *actual* understanding of their options in a Fourth Amendment analysis. *See, e.g.*, *United States v. Drayton*, 536 US 194, 203-05, 122 S Ct 2105, 153 L Ed 2d 242 (2002) (voluntariness inquiry focused on reasonableness of police conduct, not on subjective reactions of persons searched); *United States v. Garcia*, 56 F3d 418, 423 (2d Cir 1995) (stating voluntariness test in terms of whether the police officer "had a reasonable basis for believing that there had been consent to the search"); *United States v. Zapata*, 997 F2d 751, 759 (10th Cir 1993) (casting doubt on whether person's subjective characteristics are relevant to voluntariness of person's consent). Thus, although the determination of the voluntariness of consent under the Fourth Amendment applies a "totality of the circumstance" approach, the federal courts have applied that test in a way that has little if anything to do with the "consenting" party's actual understanding and intention.[3]

---

[3] In its seminal decision addressing the voluntariness of consent under the Fourth Amendment, *Schneckloth v. Bustamonte*, 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973), the Supreme Court held that a defendant's knowledge that she could refuse to consent is not necessary to a determination that the defendant voluntarily consented to a search. The court explained that the voluntariness determination instead bridges two competing concerns—the government's legitimate interest in using an individual's consent to gain access to places and things that may contain evidence of criminal activity and "the equally important requirement of assuring the absence of coercion." *Id.* at 227. Ultimately the Court in *Schneckloth* concluded that the question as to whether a defendant voluntarily consented to a search is one of fact, "to be determined from the totality of the circumstances," including both objective facts about the police conduct and subjective facts about the defendant's understanding. *Id.* at 226-27.

In contrast, our decisions under Article I, section 9, indicate that circumstances showing the defendant's actual understanding and intent are relevant to the voluntariness analysis. *See, e.g.*, *State v. Stevens*, 311 Or 119, 132-38, 806 P2d 92 (1991) (voluntariness of defendant's consent to search was assessed by considering facts about defendant's actual mental state in addition to facts about police conduct).

## C.   *Scope of Consent*

The nature of the consent exception under Article I, section 9, thus suggests that a proper inquiry into the scope of a person's consent should be concerned with the person's actual understanding and intent. But, as this court has discussed in other cases, such subjective inquiries can be problematic, if for no other reason than that they do not always promote consistency by treating like cases alike. *See, e.g.*, *State v. Ashbaugh*, 349 Or 297, 311-16, 244 P3d 360 (2010) (discussing problems with subjective approach to determining when a person has been seized for purposes of Article I, section 9).

In sum, the logic behind the consent exception supports a focus on the defendant's actual understanding and intent with respect to the scope of her consent to a search, but what a person says is often the best indicator of what the person intended. In light of those considerations, we think that the nature of the inquiry should be described in the following way: In determining whether a particular search falls within the scope of a defendant's consent, the trial court will determine, based on the totality of circumstances, what the defendant actually intended. That determination is a factual one.[4] It follows that we are bound by any findings

---

In later decisions, however, the Supreme Court has rejected consideration of circumstances that speak to the defendant's subjective understanding and intentions; instead, the Court has focused on purely objective factors, and most particularly, on the conduct of the police. *See, e.g.*, *Drayton*, 536 US at 204-07. In consequence, as one writer has observed, the test that the federal courts now employ does not so much determine whether a defendant consented voluntarily as it determines whether the conduct of the police was appropriate in the circumstances. Ric Simmons, *Not "Voluntary" but Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind L J 773, 784 (2005).

[4] Of course, the factual circumstances relating to the scope of a defendant's consent can be disputed, in which event the trial court must determine the facts.

of fact made by the trial court if constitutionally sufficient evidence supports them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017).

However, where—based on the totality of circumstances—the defendant's intent with respect to the scope of consent is unambiguously expressed, that manifestation of intent is controlling. In that way, what a reasonable person would understand by his or her choice of unambiguous words or other manifestations of intent will bear its expected weight in citizen-police interactions.[5] Such clarity in expression will be further promoted when officers requesting consent make clear to a suspect what the objects of the requested search are and what level of scrutiny is sought.

D.    *State's Proposed Corollary Rule*

With those foundational principles in mind, we turn to the state's proposed corollary rule. As discussed, the state contends that, when asked by a police officer for permission to "search" an item of personal property, a reasonable person would understand that the officer—a person whose professional duties include investigating criminal conduct—is seeking consent to open and thoroughly inspect any closed containers within the item that might contain contraband. Accordingly, the state argues, evidence that a police officer asked to "search" an item of property and that the person agreed to the request without qualification should be sufficient, by itself, to establish that the person's consent extended to opening virtually any closed but unlocked container found inside the item. That rule should apply, the state argues, unless other, specific evidence shows that the scope of consent was more limited.

We do not agree. Under the state's proposed rule, the constitutional inquiry would be limited to two circumstances when a request to search is phrased in general terms—the requestor's status as a police officer and the

---

[5] A similar approach to the determination of intent is taken in the construction of contracts, where the question of the parties' intent is one of fact, but their unambiguous manifestations of intent are controlling. *See, e.g.*, *Computer Concepts, Inc. v. Brandt*, 310 Or 706, 713, 801 P2d 800 (1990) (employing approach); *May v. Chicago Insurance Co.*, 260 Or 285, 292-94, 490 P2d 150 (1971) (same).

use of the word "search." However, those two factors are not of such paramount significance that they ordinarily would trump other surrounding circumstances.

The facts here illustrate the central role that surrounding circumstances can play in the analysis. Even if the bare facts of a police officer's general request to search an outward container, and a defendant's unqualified affirmative response, could properly be considered in isolation, those facts would not, by themselves, necessarily compel the inference that the defendant was consenting to the opening and inspection of the contents of any closed container discovered during the search of the outward container. Although it is true that a consenting person reasonably might infer from those facts alone that the officer was asking to conduct an intensive search that might extend that far, an opposing inference also would be permissible. The very generality of the request, *i.e.*, its failure to identify any particular object and its exclusive reference to the outward container itself, also could support an inference that the officer intended a quick and *proforma* inspection of the outward container, and no more. In the absence of other evidence bearing on the scope of consent, the evidence could be deemed to be in equipoise, resulting in the conclusion that the state had failed to meet its burden of persuasion. In short, the state's proposed default rule would undermine both a full-throated consideration of the totality of the circumstances bearing on the scope of the defendant's consent, and it also would not provide the certainty and predictability that the state suggests. Accordingly, we reject that rule as a corollary to the standard that we have adopted here. To reiterate that standard, in determining whether a particular search falls within the scope of a defendant's consent, the trial court will determine, based on the totality of circumstances, what the defendant actually intended. However, where, after considering those circumstances, the defendant's intent with respect to the scope of consent is unambiguously expressed, that manifestation of intent is controlling.

## IV.   APPLICATION

We now apply that standard to the record before us. As in the illustration set out above, competing inferences

could be drawn from both the officer's generalized request and defendant's unqualified response with respect to what defendant actually understood to be the scope of the officer's request and what defendant intended by his responsive manifestation of consent.

On the one hand, there is evidence in the record that would support an inference that, at the time of defendant's interaction with Sergeant Jackson, it was obvious to Jackson that defendant was under the influence of drugs. In addition, there is evidence—testimony from a forensic expert—that suggests that defendant in fact was under the influence of psilocybin mushrooms at the time.[6] It would be permissible to infer from that evidence that defendant knew that Jackson believed that he was under the influence of drugs, resulting in a shared understanding that the officer was asking for consent to look for drugs and that defendant's generalized consent therefore extended to closed containers inside the backpack that could have held drugs.

On the other hand, it would also be permissible to infer from Sergeant Jackson's generalized request to search defendant's backpack and other surrounding circumstances that the officer was not looking for any specific kind of item. Although defendant apparently understood that Jackson was a police officer, Jackson had appeared on the scene in response to defendant's report of being the possible victim of a crime. To be sure, the evidence shows that Jackson suspected that defendant was under the influence of drugs and therefore also may have suspected that defendant had drugs in his possession. But Jackson did not express either suspicion to defendant. The interaction between the officer and defendant was friendly and nonconfrontational; Jackson had even agreed to accompany defendant as he retrieved his backpack, a gesture that might give the impression that he was acting primarily as a community caretaker or that he was investigating a possible crime against defendant. Although the inference that Jackson was thus acting as defendant's ally does not suggest any particular reason why he would wish to search defendant's property, or for what, it

---

[6] Although that evidence also was relevant to the voluntariness of defendant's consent, we consider it here only as it pertains to the scope of that consent.

nevertheless would permit a further inference that Jackson was not looking for drugs or other contraband.[7] Moreover, the circumstances of the encounter also could have suggested that Jackson's request was a *pro forma* officer safety exercise or, from defendant's perspective, that the request took him by surprise and that he did not have sufficient time and knowledge to understand and appreciate that the request could implicate the scope and intensity of the search. In any event, the inference that the state seeks to draw from Jackson's status as a police officer is not the only permissible inference that could be drawn with respect to defendant's intention as to the scope of his consent to search the backpack.

The state remonstrates that defendant's consent to the search of the knotted grocery bag can be unambiguously inferred from the fact that he did not object when Jackson began to open it. The state's assertion is factually flawed: It relies on an assumption that defendant had an *opportunity* to object to Jackson's unknotting and opening of the bag, when there is no evidence in the record that supports such an assumption. As far as the evidence shows, defendant might not have even realized that Jackson was opening the bag until after the fact. At least on this record, defendant's failure to object did not constitute an unambiguous manifestation of consent to the search of closed containers inside the backpack.

In this case, it is unclear from the record whether the trial court found as fact that defendant actually intended to consent to the search of closed containers inside his backpack. Although we ordinarily would presume that a trial court found facts consistent with its ultimate suppression decision, *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014), it is not apparent that the trial court in this case understood the scope of consent determination to be the

---

[7] The Court of Appeals suggested that, in light of Jackson's apparent interest in helping defendant find his belongings, a person observing the encounter might reasonably conclude that Jackson wanted to look inside defendant's backpack to determine whether defendant's lost sweatshirt was there. *Blair*, 278 Or App at 520. However, that inference is not available on this record: According to uncontroverted evidence, defendant and Jackson already had found the missing sweatshirt at the time Jackson asked to search the backpack.

factual inquiry that we have described. Remand, therefore, is necessary to give the trial court the opportunity to determine the scope of defendant's consent under the correct standard.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is vacated, and the case is remanded to the circuit court for further proceedings consistent with this decision.